UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSE GARCIA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-cv-13093-TSH |
| | ) | |
| GARDA CL NEW ENGLAND, INC., | ) | |
| et al., | ) | |
| Defendants. | ) | |

REPORT AND RECOMMENDATION REGARDING
DEFENDANTS' RENEWED SPECIAL MOTION TO DISMISS
AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Dkt. Nos. 73, 76)

ROBERTSON, U.S.M.J.

Plaintiff Jose Garcia ("Garcia" or "Plaintiff") alleges that Defendants Garda CL New

England, Inc., ("Garda"), Gary Holland ("Holland"), Michael Kelly ("Kelly"), and Michael

Zanatta ("Zanatta") (collectively, "Defendants") falsely accused him of a number of thefts that

occurred while he was an employee of Garda, an armored car company, and maliciously

instituted and maintained criminal charges against him in connection with the thefts without

probable cause.  Garcia asserts claims against Defendants for defamation (Count I), malicious

prosecution (Count II), intentional or reckless infliction of emotional distress (Count IV), and

negligent infliction of emotional distress (Count V).[1]

Shortly after removing the case from Massachusetts state court, where Plaintiff initiated

it, Defendants filed a special motion to dismiss under Mass. Gen. Laws ch. 231, § 59H, the so-

called "anti-SLAPP" statute (Dkt. No. 8), which the court (Ponsor, J.) denied without prejudice

---

[1] Garcia also made a claim for violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I (Count III), but the court dismissed it for failure to state a claim (Dkt. No. 25).

in order to permit Garcia to conduct discovery as contemplated by the statute (Dkt. No. 25).

Discovery is now complete, and Defendants have filed a renewed special motion to dismiss (Dkt.

No. 76; *see also* Dkt. Nos. 77, 91), as well as a motion for summary judgment on all counts of

Garcia's complaint (Dkt. No. 73; *see also* Dkt. Nos. 74-75, 84, 86). Garcia opposes both

motions (Dkt. Nos. 80, 81; *see also* Dkt. Nos. 82-83). The court has considered all of the

pleadings and heard the parties at oral argument (Dkt. No. 99) and, for the reasons set forth

herein, recommends that Defendant's special motion to dismiss be DENIED and Defendants'

motion for summary judgment be GRANTED.

I. FACTS[2]

On December 20, 2012, 29 small bags of money arrived at the Springfield, Massachusetts

branch of Garda ("Garda Springfield"), an armored car company, where the bags were counted

and placed inside a large, heavy gauge bag called a "clearing bag," which was then placed inside

the branch's vault (DSUF 1, 10, 15; PRDSUF 1, 10, 15). The following day, December 21,

2012, Garcia and Maurice Chin, both employees of Garda, took possession of the clearing bag

for delivery to a Loomis facility in Boylston, Massachusetts ("Loomis Boylston") (DSUF 1, 8-9,

---

[2] The facts are drawn from Defendants' statement of undisputed material facts in support of
Defendants' motion for summary judgment ("DSUF") (Dkt. No. 75), Plaintiff's response to
Defendants' statement of undisputed material facts ("PRDSUF") (Dkt. No. 82), Plaintiff's
statement of disputed material facts ("PSDF") (Dkt. No. 82), and Defendants' response to
Plaintiff's statement of disputed material facts ("DRPSDF") (Dkt. No. 86), to the extent that they
are supported – and as they are elucidated – by the material in the summary judgment record.
The court also takes notice of the docket and certain orders of the Hampden County Superior
Court in the criminal proceeding brought against Garcia in connection with the alleged thefts,
*Commonwealth v. Garcia*, Hampden Cty. Mass. Sup. Ct. Dkt. No. 1379CR00824. *See United
States v. Florentino*, 385 F.3d 60, 65 (1st Cir. 2004), *vacated on other grounds*, 544 U.S. 1058
(2005) (noting that courts are "entitled to take notice of the records of relevant court
proceedings"). For purposes of the Defendants' motion for summary judgment, the facts are
construed in the light most favorable to Plaintiff, the non-moving party, meaning that where
Plaintiff has disputed the accuracy of a fact Defendants included, the court includes the
alternative offered by Plaintiff, provided the assertion is adequately supported by the material in
the record.

16; PRDSUF 1, 8-9, 16). Chin, as the driver, and Garcia, as the messenger, were normally responsible for the "Needham shuttle" route, which started at Garda Springfield and then made stops at a Brink's facility and a jeweler, both also located in Springfield, Loomis Boylston, and a Garda branch in Needham, Massachusetts ("Garda Needham"), before returning to Garda Springfield (DSUF 8-9, 34; PRDSUF 8-9, 34). When Garcia and Chin delivered the clearing bag in question to Loomis Boylston on December 21, 2012, it contained only 24 smaller bags of money, not 29 (DSUF 17; PRDSUF 17). The five missing bags contained a total of $76,000.00 in cash (DSUF 18; PRDSUF 18). Garcia promptly notified Melvin Diaz, the Garda Springfield night vault manager to whom Garcia reported, that the bags were missing from the delivery to Loomis Boylston (DSUF 2; PRDSUF 2; PSDF 26; DRPSDF 26). Garcia did not notify Gary Holland, the Garda Springfield branch manager and the other individual to whom Garcia reported (PSDF 2, 12; DRPSDF 2, 12).

Nearly one month later, on January 14, 2013, Garda client support notified Holland that two Garda clients were reporting that cash Garda had picked up from them on December 20, 2012 was never deposited in their banks and was missing (DSUF 11; PRDSUF 11). While nearly a month had elapsed, it was not uncommon for Garda to be notified of losses several months after the fact (DSUF 50; PRDSUF 50). This was the first Holland learned of the missing money, and he undertook to look into the matter on January 14 and January 15, 2013 (DSUF 12; PRDSUF 12). Holland first reviewed relevant Garda paperwork, which confirmed that the money had been picked up from the clients and delivered to Garda Springfield on December 20, 2012 (DSUF 13; PRDSUF 13). Holland then watched Garda's surveillance video of the Springfield vault from December 20 to December 21, 2012; according to Holland, the video showed the 29 small bags of money arriving at the branch, being counted, and being sealed into

the clearing bag, which was then placed inside Garda Springfield's vault, where it sat untouched overnight until it was signed over to Garcia and Chin the following morning (DSUF 14-15; PRDSUF 14-15).[3]  Finally, Holland reviewed the manifest for the December 21, 2012 delivery to Loomis Boylston, which showed only 24 bags of money being delivered, not 29, with the five missing bags containing $76,000.00 in cash (DSUF 17-18; PRDSUF 17-18).  Having completed his review, Holland filled out a Security Incident Report ("SIR") about the loss and submitted it to Garda corporate security (DSUF 19; PRDSUF 19).  In the SIR, Holland stated inaccurately that the missing bags had not been reported to base when they had, insofar as Garcia had reported the missing bags to Diaz on the date of the loss, although he had not reported them to Holland (PSDF 27; DRPSDF 27).

    Garda security investigators Kelly and Zanatta were assigned to investigate the loss (DSUF 20; PRDSUF 20).  Both Kelly and Zanatta reviewed Garda Springfield's surveillance video; both maintain that it revealed the same sequence of events as Holland reported, i.e. that on December 20, 2012, 29 small bags of money arrived at Garda Springfield and were sealed into a clearing bag, which was then placed inside the Garda Springfield vault overnight, where it remained untouched until it was signed over to Garcia and Chin the following morning (DSUF

_____

[3] Garcia claims that he is unable to dispute that the clearing bag sat untouched overnight in the vault because Garda failed to secure and preserve the vault video.  In doing so, Garcia invokes Fed. R. Civ. P. 56(d).  Rule 56(d)'s purpose is to protect litigants who "justifiably need[ ] additional time to respond in an effective manner to a summary judgment motion."  *Rivera-Almodovar v. Instituto Socioeconomico Comunitario, Inc.*, 730 F.3d 23, 28 (1st Cir. 2013) (citing *Vargas-Ruiz v. Golden Arch Dev., Inc.*, 368 F.3d 1, 3 (1st Cir. 2004)).  It has no applicability here, where discovery is complete.  Holland's testimony and, as will be discussed *infra*, the corroborating testimony of Kelly and Zanatta that they all watched the video and it showed that the money remained untouched in the vault overnight is evidence of just that.  Additionally, there is evidence that a Springfield Police Department ("SPD") officer watched the video and swore out complaints against Garcia and Chin thereafter, from which the only reasonable inference is that the video showed that the money was not tampered with overnight.  On the other hand, there is no evidence in the record that the money was touched while it sat in the vault overnight.

21). At some point – it is unclear exactly when – Loomis Boylston permitted Kelly to watch the portion of its surveillance video in which Garda handed the clearing bag over to Loomis with only 24 bags (DSUF 17, 30; PRDSUF 17, 30).

On January 18, 2013, Kelly and Zanatta went to Garda Springfield, where they separately interviewed Garcia and Chin about the loss and obtained a written statement from each of them (DSUF 2, 22-23, 27-28; PRDSUF 2, 22-23, 27-28; PSDF 10). Both Garcia and Chin denied any involvement in or knowledge about the missing bags (DSUF 24-25, 27; PRDSUF 24-25, 27). Kelly and Zanatta interviewed Garcia first, after asking him to surrender his gun (PSDF 5-9). When the interview began, Kelly, who was introduced to Garcia as the head of corporate security, accused Garcia of stealing money from Garda; when Garcia denied taking any money, Kelly told him that it had to have been him or Chin (*id.*). Kelly told Garcia that if he did not help "bring [Chin] down," Garcia would be jeopardizing his and Holland's jobs (*id.*). According to Garcia, this pattern of Kelly accusing Garcia, Garcia denying any wrongdoing, and Kelly telling Garcia that he had to help "bring [Chin] down," continued for about twenty minutes (*id.*). During this time, Kelly was "up into [Garcia's] face" screaming at him (*id.*). Kelly then took Garcia to Holland's office to wait while he interviewed Chin for approximately ten minutes (*id.*). Thereafter, Kelly brought Garcia back into the interview room and told him that Chin had implicated him (*id.*). Garcia continued to maintain his innocence, and Kelly spent the next ten minutes screaming at him that he needed to help bring Chin down or he would be jeopardizing his own and Holland's jobs (*id.*). Kelly also told Garcia that if he did not help, Kelly would have to "go downtown," which Garcia took to mean Kelly was going to go to the police if Garcia did not accuse Chin (*id.*). Zanatta did not get in Garcia's face or scream at him at any point during either session (*id.*).

Holland interviewed Diaz, who also denied taking any of the money (DSUF 27; PRDSUF 27). Kelly could not recall interviewing Diaz, but in a January 23, 2013 email to Vincent Modarelli of Garda, Kelly stated that Diaz had been interviewed, and he appended a handwritten statement from Diaz to the email (PSDF 13-14; DRPSDF 13). In the statement, Diaz protested his innocence and stated that he had "received several calls … about missing bags from Loomis Boylston" (PSDF 14.). Diaz reported that he had told Garcia not to report missing bags to Holland, and, instead, to bring any manifests showing missing bags to him, and he would look into them (*id*.) According to Diaz, however, he forgot to look into the issue of the missing bags from December 21, 2012 (*id*.). Kelly could not recall having been told by Diaz (or anyone else) on January 18, 2013, that money had been reported missing from the Loomis Boylston shuttle on other occasions, and he did not look through manifests for any other dates to identify additional losses (PSDF 18-19; DRPSDF 18-19).

According to Garcia, Kelly did not ask him if Chin had ever left his sight during the Needham shuttle route on December 21, 2012, and, in fact, Chin was alone in the truck when Garcia went inside the jeweler's in Springfield and when Garcia went inside Loomis Boylston to wait for a truck bay to open up (PSDF 10-11). As a matter of course, when the shuttle stopped at the jeweler's, Garcia would leave the truck and wait inside the office with security for as long as two hours, leaving Chin alone in the truck (PSDF 44; DRPSDF 44). At Loomis Boylston, Garcia would again leave the truck and wait inside for a truck bay to open for as long as an hour-and-a-half, again leaving Chin alone in the truck (PSDF 45; DRPSDF 45). Nonetheless, Kelly told Vincent Modarelli of Garda in his January 23, 2013 email that Garcia had stated that Chin never left his sight during the run on December 21, 2012 (PDSF 11; DRPDSF 11). Kelly testified that what he meant by this was that Chin never left Garcia's sight in any unsecured

areas, as opposed to areas that were secured and under camera surveillance, such as the jewelry store in Springfield and Loomis Boylston (PSDF 11; DRPSDF 11). Following their interviews on January 18, 2013, Garda suspended Garcia's and Chin's employment (DSUF 29; PRDSUF 29).[4]

Later in the day on January 18, 2013, Kelly and Zanatta went to the Springfield Police Department ("SPD"), where they met with Lieutenant Maurice Kearney ("Lt. Kearney"), to report the loss (DSUF 33-34; PRDSUF 33-34). Kelly and Zanatta advised Lt. Kearney that Garcia and Chin had been the messenger and driver, respectively, on the truck from which the money had gone missing (DSUF 34; PRDSUF 34). They provided him with supporting paperwork and a copy of the portion of Garda's surveillance video showing the 29 bags of money arriving at Garda Springfield and being placed into the clearing bag (DSUF 35; PRDSUF 35). Kelly and Zanatta told Lt. Kearney that there was additional surveillance video available at Garda Springfield showing the clearing bag sitting in the vault, as well as video at Loomis Boylston, and that SPD should follow up to get that evidence (DSUF 36; PRDSUF 36). Neither Kelly nor Zanatta asked the SPD to bring criminal charges against Garcia (DSUF 37; PRDSUF 37). Kelly told Lt. Kearney that he believed Garcia and Chin were responsible for the theft (PRDSUF 37).

Several days later, on January 21, 2013, Holland met with Lt. Kearney and provided him with a written statement that he had prepared that day concerning what he had learned about the

---

[4] Garda terminated Chin's employment on August 1, 2013, as a result of "dishonesty-theft" related to the missing funds from the Loomis Boylston shuttle (PSDF 31; DRPSDF 31). Garcia maintains that his employment was effectively terminated on January 18, 2013, while Garda takes the position that his employment was not terminated until some unspecified time thereafter (DSUF 72; PRDSUF 72; PSDF 32-34; DRPSDF 32-34). For purposes of this motion, it is undisputed that Garda has no paperwork showing a date on which Garcia's employment with Garda was terminated.

December 21, 2012 loss (DSUF 40-42; PRDSUF 40-42).  He told Lt. Kearney that Garda's security department would be providing SPD with a copy of surveillance video footage tracking the missing bags of money from the time they came into Garda Springfield on December 20, 2012, to the time the bags left on the Needham shuttle truck on December 21, 2012 (PRDSUF 47).  Holland did not directly accuse Garcia of taking the money, nor did he ask the SPD to bring criminal charges against Garcia (DSUF 37, 43; PRDSUF 37, 43).

Lt. Kearney went to Garda Springfield to watch the surveillance video (DSUF 44; PRDSUF 44).  Later that same day, Lt. Kearney filed a criminal complaint for the loss and requested and obtained an arrest warrant for Garcia (DSUF 48; PRDSUF 48).  Garcia was arrested on January 30, 2013, in front of his mother, his girlfriend, and a neighbor (DSUF 48; PRDSUF 48; PSDF 49; DRPSDF 49).  He was embarrassed and humiliated by the experience of being arrested and held in the police cell (PSDF 49; DRPSDF 49).  He posted bail the following day and was released (*id.*).  Two or three days after Garcia was released on bail, on February 1 or 2, 2013, the SPD tried to arrest him outside of his home, but he talked them out of it (DSUF 82-83; PRDSUF 82-83).

On February 8, 2013, Holland passed along information to Kelly, who, in turn, notified the SPD, regarding additional losses from the Needham shuttle route occurring on September 17, 2012, and January 2 and 3, 2013 (DSUF 49, 52; PRDSUF 49, 52).  Garcia and Chin were responsible for the Needham shuttle on September 17, 2012, but Garcia was not on the shuttle on January 2 or 3, 2013; Chin was on the shuttle with another Garda employee, Larry Caragnano (DSUF 49, 57, 60; PRDSUF 49, 57, 60; PSDF 20, 43; DRPSDF 43).  By that time, Kelly was aware that Chin had fled to Jamaica and that the SPD had been unable to locate him (PSDF 50; DRPSDF 50).

Both Holland and Kelly were already aware of the September 17, 2012 loss and had been by as early as late September 2012, at which time they had spoken to Garcia about it (PRDSUF 49; PSDF 20). Garcia had immediately notified Diaz of the loss and had reported it to Holland by initialing the manifest indicating that four bags containing $45,000 had been missing from the clearing bag upon delivery to Loomis Boylston and leaving the manifest on Holland's desk, although Holland had forgotten about it (PSDF 21, 43; DRPSDF 43). Garda had also been notified by the customer about the loss on three separate occasions in October and November 2012 (*id*.). The September 17, 2012 loss involved a shipment that originated from Garda Needham rather than Garda Springfield, however, so any service request related to it would have gone to Garda Needham (DSUF 51; PRDSUF 51).

On February 15, 2013, Holland gave a second written statement to the SPD regarding the September 17, 2012 and January 2, 2013 losses (DSUF 56; PRDSUF 56). In Holland's statement to the SPD, and in a SIR Holland completed on February 8, 2013, Holland reported that Garcia was on the truck on January 2, 2013, when he was not (DSUF 55, 57; PRDSUF 55, 57). Holland did provide the SPD with the January 2, 2013 manifest, which showed Caragnano's signature rather than Garcia's (DSUF 58; PRDSUF 58). Holland did not ask the SPD to bring additional charges against Garcia in connection with either loss (DSUF 52; PRDSUF 52).

Six days later, on February 21, 2013, Kelly sent Lt. Kearney an email informing him of the January 3, 2013 loss from the Needham shuttle truck (DSUF 59; PRDSUF 59). Kelly accurately reported to Lt. Kearney that Chin and Caragnano were on the truck for that route and asked that Lt. Kearney add this loss to the SPD investigation (DSUF 60; PRDSUF 60).

On February 26, 2013, complaints issued against Garcia in connection with the September 17, 2012 and January 2, 2013 losses (PRDSUF 84). As to each date, Garcia was charged with larceny over $250 in violation of Mass. Gen. Laws ch. 266, § 30 (1) and possession of a firearm in the commission of a felony in violation of Mass. Gen. Laws ch. 265, § 18B (Dkt. No. 81-11). Garcia's bail did not increase, nor did he have to go back to the police station as a result of the new complaints, but he did have to go to court several times in relation to them (DSUF 84; PRDSUF 84).

The District Attorney brought a case against Garcia before a Grand Jury (DSUF 61; PRDSUF 61). Holland, Kelly, and Lt. Kearney all testified (*id.*). Holland identified Caragnano as having been on the truck on January 2, 2013, rather than Garcia, as he had earlier indicated in his statement to the SPD (DSUF 62; PRDSUF 62). Holland testified in the Grand Jury that he meant to put Caragnano's name in his statement to the police (PRDSUF 57). In subsequent deposition testimony, Holland testified that he made a mistake because he thought he saw Garcia's initials on the manifest (*id.*) Holland also testified in the Grand Jury that the type of truck used for the Needham shuttle does not allow for access from the cab of the truck into the back of the truck where the money is located; the only way to get to the money would be to take a high security lock off an access door from the outside (PSDF 38). In his deposition, Holland testified that there was an emergency hatch behind the seats from which the rear of the truck could be accessed from the inside; while it was generally bolted, he had no idea if it was bolted on September 17 or December 21, 2012, or January 2 or 3, 2013 (PSDF 39).

On July 2, 2013, Garcia and Chin were each indicted for one count of larceny over $250 and one count of possession of a firearm in the commission of a felony in connection with the December 21, 2012 loss (DSUF 63-64; PRDSUF 63-64; *see also Commonwealth v. Garcia*,

Hampden Cty. Mass. Sup. Ct. Dkt. No. 1379CR00824). In November 2013, Garcia and Chin filed discovery motions in their criminal cases seeking numerous documents from Garda (DSUF 65; PRDSUF 65). By that time, Kelly's employment with Garda had been terminated based on the elimination of his position (DSUF 66; PRDSUF 66). It fell to Zanatta to try to produce the items responsive to Garcia's and Chin's discovery requests (DSUF; PRDSUF 67). Zanatta went through boxes that Kelly had left behind, but he was unable to locate the case file and some of the other requested information (DSUF 68; PRDSUF 68). Zanatta provided copies of all of the responsive documents that he was able to find to the District Attorney's office (DSUF 69; PRDSUF 69). Neither Zanatta, Kelly, nor Holland ever provided the SPD or the District Attorney's office with a copy of the Diaz statement (PSDF 15; DRPSDF 15). Nor did they provide the SPD or the District Attorney's office with a copy of the overnight surveillance video of the vault from December 20 through December 21, 2012; because Garda's internal video recordings are retained for only 90 days, it was no longer in existence (PSDF 37; DRPSDF 37). Zanatta had attempted to save the overnight video, but he had been unable to do so because the file was too large; he had requested help from Garda's Information Technology Department, but they, too, were unable to save the file (DSUF 45-46; PRDSUF 45-46). The SPD and District Attorney's office also never received a copy of the video evidence from Loomis Boylston; while Kelly had asked the investigator for Loomis Boylston to secure the video recording from December 21, 2012, for any future criminal proceedings, he never contacted anyone from Loomis Boylston with respect to the September 2012 and January 2013 losses, nor did he request that Loomis Boylston preserve and maintain the video evidence or tell the SPD that Garda was not going to make efforts to preserve it (PRDSUF 31; PSDF 23-24; DRPSDF 23-24).

Counsel for Garcia filed two motions to dismiss in the criminal case (*Commonwealth v. Garcia*, 1379CR00824, Hampden Cty, Mass. Sup. Ct. Dkt. at 19-20, 28)). The first motion sought dismissal pursuant to, *inter alia*, *Commonwealth v. McCarthy*, 430 N.E.2d 1195 (Mass. 1982), in which the Supreme Judicial Court ("SJC") held that "at the very least[, a] grand jury must hear sufficient evidence to establish the identity of the accused … and probable cause to arrest him," *id*. at 1197 (citations omitted), the latter of which requires "'reasonably trustworthy information … sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense,'" *id*. (quoting *Commonwealth v. Stevens*, 283 N.E.2d 673, 675 (Mass. 1972)). The court denied the motion, finding that there was probable cause to support the indictments:

> There was more than sufficient evidence from which the grand jurors could conclude that [Garcia and Chin] left the Springfield facility with, among other items, the clearance bag in question that contained twenty-nine separate deposit bags, totaling $127,132.79 in U.S. currency. Significantly, the grand jurors could also conclude that the defendants delivered to Loomis-Boylston on that same day, the clearance bag in question, but, at that point, the clearance bag contained only twenty-four separate deposit bags. Five specific deposit bags, all listed on the original manifest, were missing. Together those five bags contained $76,000. In a statement given during the investigation of this matter, the defendant, Jose Garcia, wrote that, at [Diaz's] urging, he did not report the five bags were missing to [Holland].
>
> ….
>
> [T]he standard at this stage is a mild one. The case presented to the grand jury was entirely a circumstantial case. The points, expressly and inferentially, raised by [Garcia and Chin] in their motions, namely, that there was no direct evidence that the defendants stole the money and that the supervisors … suspiciously either failed to report or failed to discover the loss of $76,000 and have since been terminated from their employment by [Garda], point out weaknesses in the Commonwealth's case and constitute significant fodder for cross examination, but they do not render the presentation to the grand jury insufficient.

> The quantum of evidence required to indict and commence
> prosecution is considerably less exacting than that required of the
> petit jury that adjudicates guilt. When considering the sufficiency
> of the evidence to sustain a grand jury indictment, the court need
> not determine that the evidence would allow a reasonable person to
> find that the defendants committed the criminal conduct beyond a
> reasonable doubt; rather, the court must only find "the evidence
> sufficient for a grand jury to find probable cause that the crime
> charged has been committed by these defendants."
> *Commonwealth v. Levesque*, 766 N.E.2d 50, 59 (Mass. 2002).
> This the Commonwealth did.

*Commonwealth v. Garcia*, 1379CR00824, Hampden Cty, Mass. Sup. Ct. Dkt. Nos. 13-823 & 13-824, Memorandum of Decision and Order on Defendants' Motions to Dismiss Indictments (Apr. 1, 2014) (Carey, J.). On September 24, 2014, the court granted the second motion to dismiss based on Garda's failure to produce discovery. In its memorandum of decision and order, the court stated that "there was a loss of material evidence in th[e] case attributable to Garda's negligent and reckless failure to preserve and produce evidence deemed relevant by th[e] court," including documents setting forth the names and addresses of the Loomis-Boylston employees who received the bags in question; copies of all employee manuals and policies explaining the responsibilities of the driver, crew leader, and vault manager; video from Loomis-Boylston showing the process by which the bags were opened and transferred to Loomis-Boylston and Garcia's and Chin's reactions to the discovery of the missing money; the overnight video from the Garda vault; employee timesheets; all internal reports regarding Garda's investigation; documents regarding additional incidents where money was not accounted for; and employment records for Holland, Diaz, Kelly, Holland, and Gary Matos (DSUF 71; PRDSUF 71; Dkt. No. 11-6 at 6-7; 15).

Garcia instituted this action in state court on June 22, 2015, and Defendants removed it to this court on August 6, 2015 (Dkt. No. 1). Garcia avers that, as a result of the accusations made against him and the loss of his job, he has been diagnosed with depression and post-traumatic stress disorder (Dkt. No. 83 at 3). He sees a therapist on a regular basis, is on several medications for his emotional problems, and has trouble sleeping and panic attacks (*id.*).

II.    DISCUSSION – THE RENEWED SPECIAL MOTION TO DISMISS

Massachusetts General Laws ch. 231, § 59H, popularly known as the "anti-SLAPP" law,[5] *Duracraft Corp. v. Holmes Prods. Corp.*, 691 N.E.2d 935, 938-39 (Mass. 1998), provides that:

> In any case in which a party asserts that the civil claims, counterclaims, or cross claims against said party are based on said party's exercise of its right of petition under the constitution of the United States or of the commonwealth, said party may bring a special motion to dismiss. …. The court shall grant such special motion, unless the party against whom such special motion is made shows … : (1) that the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) that the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

Mass. Gen. Laws. ch. 231, § 59H. "The Legislature enacted the anti-SLAPP statute to counteract 'SLAPP' suits, defined broadly as 'lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'" *Blanchard v. Steward Carney Hosp., Inc.*, 75 N.E.3d 21, 29 (Mass. 2017) (quoting *Duracraft*, 691 N.E.2d at 939). "The main 'objective of SLAPP suits is not to win them, but to use litigation to intimidate opponents' exercise of rights of petitioning and speech.'" *Id.* (quoting

---

[5] "The acronym SLAPP stands for 'strategic litigation against public participation.'" *Maxwell v. AIG Domestic Claims, Inc.*, 893 N.E.2d 791, 793 n.2 (Mass. App. Ct. 2006) (quoting *Garebedian v. Westland*, 796 N.E.2d 439, 442 n.2 (Mass. App. Ct. 2003)).

*Duracraft*, 691 N.E.2d at 940). The anti-SLAPP statute established the special motion to dismiss as a procedural mechanism that can be brought prior to discovery to forestall such disfavored lawsuits early in the litigation and with a mandated award of attorney's fees and costs to successful special movants. *Id*. The First Circuit has confirmed that state anti-SLAPP statutes apply to state-law claims in federal court proceedings. *Godin v. Schencks*, 629 F.3d 79, 92 (1st Cir. 2010) (concluding that the Maine anti-SLAPP statute was substantive and, therefore, applied in federal court); *see also Steinmetz v. Coyle & Caron, Inc.*, No. 15-cv-13594-DJC, 2016 U.S. Dist. LEXIS 99631, at *8 (D. Mass. July 29, 2016) (extending the reasoning and conclusion of *Godin* to the Massachusetts anti-SLAPP statute).

In *Duracraft*, 691 N.E.2d at 943, the SJC established a two-part burden-shifting framework for special motions to dismiss brought under the anti-SLAPP statute, which it augmented quite recently, and after briefing and oral argument on Defendants' special motion to dismiss, in *Blanchard*, 75 N.E.3d at 38-39. To invoke the statute's protection under the *Duracraft-Blanchard* framework, "the special movant need show, as a threshold matter, through pleadings and affidavits, that the claims against it are, in fact, 'based on' its petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities." *Office One, Inc. v. Lopez*, 769 N.E.2d 749, 757 (Mass. 2002). "The focus solely is on the conduct complained of, and if the only conduct complained of is petitioning activity, then there can be no other 'substantial basis' for the claim." *Id*. (citing *Fabre v. Walton*, 781 N.E.2d 780, 786 (Mass. 2002)). On the other hand, the fact that some petitioning activity is implicated will not be enough where "the root of the claims … is nonpetitioning." *Maxwell v. AIG Domestic Claims, Inc.*, 893 N.E.2d 791, 799 (Mass. App. Ct. 2006) (quoting *Garebedian v. Westland*, 796 N.E.2d 439, 444 (Mass. App. Ct. 2003)). "In assessing the conduct complained of, a judge considers

only the allegations that are relevant to the discrete causes of action brought." *477 Harrison Ave., LLC, v. Jace Boston, LLC*, 74 N.E.3d 1237, 1244 (Mass. 2017). At this initial stage, the motive behind the petitioning activity is irrelevant. *Id*. (citing *Fabre*, 781 N.E.2d at 785-86). "If the moving party fails to make such a showing, the special motion must be denied." *Benoit v. Frederickson*, 908 N.E.2d 714, 718 (Mass. 2009) (citing *Wenger v. Aceto*, 883 N.E.2d 262, 266 (Mass. 2008)).

Where the moving party makes the requisite showing, the burden shifts to the nonmoving party to defeat the special motion to dismiss. *477 Harrison Ave.*, 74 N.E.3d at 1244. Following the SJC's decision in *Blanchard*, "the nonmoving party can now meet its second stage burden in two ways." *Id*. First, it may establish, "by a preponderance of the evidence, through the pleadings and affidavits, that the moving party's petitioning activities were 'devoid of any reasonable factual support or any arguable basis in law' and that the petitioning activities 'caused actual injury to the [nonmoving] party.'" *Benoit*, 908 N.E.2d at 718 (alteration in original) (quoting Mass. Gen. Laws. c. 231, § 59H). "The critical determination [at this point] is not whether the petitioning activity in question will be successful, but whether it contains any reasonable factual or legal merit at all." *Wenger*, 883 N.E.2d at 267. "The special movant's motivation for engaging in petitioning activity does not factor into whether their petitioning activity is illegitimate." *477 Harrison Ave*., 74 N.E.3d at 1248 (footnote omitted) (citing *Wenger*, 883 N.E.2d at 268 (nonmoving party's contention that special movant filed criminal complaint with ulterior motive irrelevant because criminal complaint had reasonable basis in law)). "If these showings are made, by a preponderance of the evidence, then the special motion to dismiss must be denied." *Wenger*, 883 N.E.2d at 266.

If the non-moving party cannot make this showing, it "may [yet] meet its second-stage burden and defeat the special motion to dismiss by demonstrating in the alterative that each challenged claim does not give rise to a 'SLAPP' suit." *Blanchard*, 75 N.E.3d at 38.

> It may do so by demonstrating that each such claim was not primarily brought to chill the special movant's legitimate petitioning activities. To make this showing, the nonmoving party must establish, such that the motion judge may conclude with fair assurance, that its primary motivating goal in bringing its claim, viewed in its entirety, was "not to interfere with and burden defendants' … petition rights, but to seek damages for the personal harm to [it] from [the] defendants' alleged … [legally transgressive] acts." *Sandholm v. Kuecker*, 962 N.E.2d 418, 434 (Ill. 2012). The nonmoving party must make this showing with respect to each such claim viewed as a whole. In applying this standard, the motion judge, in the exercise of sound discretion, is to assess the totality of the circumstances pertinent to the nonmoving party's asserted primary purpose in bringing its claim.

*Id*. at 38-39 (alterations in original) (footnote omitted). Factors that may be pertinent to this determination include "[t]he course and manner of proceedings, the pleadings filed, … affidavits 'stating the facts upon which the liability or defense is based,' …. [and] whether the nonmoving party's claim at issue is 'colorable or … worthy of being presented to and considered by the court.'" *Id*. at 39 (final alteration in original) (citations omitted). If the nonmoving party makes this alternative second-stage showing, the special motion to dismiss must be denied; if not, it must be allowed. *Id*.

Defendants have met their initial burden as to Garcia's claims for malicious prosecution and defamation by showing that they are based on their petitioning activities alone and have no other substantial basis. "[R]eporting suspected criminal activity to the police and filing criminal complaints are activities the anti-SLAPP statute firmly protects." *Keegan v. Pellerin*, 920 N.E.2d 888, 891 (Mass. App. Ct. 2010) (citing *Wenger*, 883 N.E.2d at 267; *Benoit v. Frederickson*, 908 N.E.2d 714, 718 (Mass. 2009)). This protection encompasses Garcia's

malicious prosecution claim, which is founded on Holland, Kelly, and Zanatta "bringing and maintaining criminal charges against Garcia" (Dkt. No. 1-1 at 20, ¶ 77), as well as any statements Defendants made to the SPD asserting that "Garcia had committed one or more criminal acts," as alleged in Garcia's claim for defamation (Dkt. No. 1-1 at 9, ¶¶ 27, 29; 12, ¶¶ 42, 44; 13, ¶¶ 46; 14, ¶ 49; 19, ¶ 73).

Defendants have not met their threshold burden with respect to Garcia's claim for intentional or reckless infliction of emotional distress or negligent infliction of emotional distress, which are premised not only on Defendants' petitioning activity, but also on non-petitioning activity, specifically its allegedly deficient investigation. Thus, Defendants' renewed special motion to dismiss must be denied as to Garcia's claims for intentional or reckless infliction of emotional distress and negligent infliction of emotional distress.

As to Garcia's claims for malicious prosecution and defamation, the burden shifts to Garcia to demonstrate that the defendant's petitioning activity was devoid of any reasonable factual support or any arguable basis in law and caused him actual harm. Stated another way, Garcia "must show that 'no reasonable person could conclude' that [Defendants'] report to the police was supported either in fact or in law." *Keegan*, 920 N.E.2d at 892 (quoting *North Am. Expositions Co. Ltd. P'ship v. Corcoran*, 898 N.E.2d 831, 843 (Mass. 2009)). Garcia cannot meet his burden if Defendants "had reasonable factual support" for their reports to the SPD, even if the reports turned out to have been erroneous. *Id.* (citing *Wenger*, 883 N.E.2d at 267). "Moreover, [Defendants] demonstrate[] 'reasonable factual support' if [their submissions] contain 'evidence that, if believed, would support a finding in' [their] favor." *Id.* (quoting *Benoit*, 908 N.E.2d at 719 n.7). Under this rubric, a judge faced with a special motion to dismiss "is to determine whether a finding in the defendant's favor would be warranted if she believed

the contents of the defendant's proffer." *Id*. at 892 n.5. The judge does not take the next step and decide whether she actually believes the proffer because, "'[t]he question to be determined by a judge in deciding a special motion to dismiss is not which of the parties' pleadings and affidavits are entitled to be credited or accorded greater weight, but whether the nonmoving party has met its burden (by showing that the underlying petitioning activity by the moving party was devoid of any reasonable factual support or arguable basis in the law, and whether the activity caused actual injury to the nonmoving party).'" *Id*. (alteration in original) (quoting *Benoit*, 908 N.E.2d at 719 n.7).

Garcia has not met this difficult burden on this record. *Id.* at 892 (noting that the non-movant's showing is "difficult to meet"). If one believes Defendants' submissions, their initial report to the police on January 18, 2013, was based on evidence that Garcia and Chin left Garda Springfield on December 21, 2012, with a clearing bag containing 29 deposit bags and that, when they delivered the clearing bag to Loomis Boylston, it contained only 24 deposit bags, with the five missing bags containing a total of $76,000, and that no one other than Garcia and Chin had access to the money during the time it went missing. Under those circumstances, Garcia cannot show that Defendants' reports to the police about the December 21, 2012 loss were devoid of any reasonable factual support. Indeed, Lt. Kearney swore out a criminal complaint and a grand jury found probable cause to issue indictments against Garcia in connection with this loss, a finding that was upheld by the Superior Court Judge following a motion to dismiss the indictment.

The only report to the SPD for which Garcia maintains Defendants lacked factual support was Holland's report that Garcia was on the Loomis Boylston shuttle on January 2, 2013, when he was not. In the court's view, Garcia tries to draw too fine a line to reach his desired outcome.

Garcia has to show that the underlying petitioning activity was devoid of any reasonable factual support. The petitioning activity in question is Holland's report to the police on February 15, 2013. On that date, he reported to the SPD about both the September 17, 2012 and January 2, 2013 losses. Garcia does not dispute that he was on the Needham shuttle on September 17, 2012; therefore, Holland's petitioning activity had reasonable factual support. While Holland erroneously advised SPD that Garcia was on the shuttle on January 2, 2013, he did provide the SPD with a copy of the manifest showing that Garcia was not on the shuttle, and, in his testimony to the Grand Jury, he stated that Garcia was not on the January 2, 2013 shuttle. Thus, the court concludes that Garcia has not shown that Defendants' petitioning activity was devoid of any factual support.

Nonetheless, post-*Blanchard*, Garcia's claims based on Defendants' legitimate petitioning activity can still survive the special motion to dismiss if he demonstrates that each challenged claim does not give rise to a "SLAPP" suit. *Id.*, 75 N.E.3d at 38. The court finds that Garcia has met this alternative burden by demonstrating that he did not bring these claims to chill Defendants' legitimate petitioning activities. Garcia did not file his complaint in state court until June 22, 2015, nearly nine months after the indictments against him were dismissed. Accordingly, there is no basis for inferring that Garcia was motivated to deter Garda from participating in the prosecution against him and Chin. Moreover, Garcia was no longer employed by Garda, so there is no basis for inferring that he was motivated to deter Garda from reporting other allegedly criminal activity by him or anyone else to the police. In addition, Garcia has attested that he has "experienced real emotional problems," as a result of Defendants' legitimate petitioning activities, including depression, post-traumatic stress disorder, trouble sleeping, and panic attacks (Dkt. No. 83 at 3, ¶ 10), and these claims are plausible in view of his

claim that Garda initiated his prosecution for thefts he did not commit. Under these circumstances, viewing the claims for malicious prosecution and defamation as a whole, the court cannot conclude that they are "strategic litigation against public participation" suits. Therefore, on the authority of *Blanchard*, the court recommends that Defendants' renewed special motion to dismiss be DENIED in its entirety.

III.    DISCUSSION – THE MOTION FOR SUMMARY JUDGMENT

A.    Summary Judgment Standard

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rojas–Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de P.R.,* 394 F.3d 40, 42 (1st Cir. 2005) (internal quotations and citation omitted). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the summary judgment context, "[a] factual dispute is 'genuine' if 'it may reasonably be resolved in favor of either party' and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990) (citations and internal quotation marks omitted)). "[A] fact is 'material' 'if its existence or nonexistence has the potential to change the outcome of the suit.'" *Jarvis v. Village Gun Shop, Inc.*, 805 F.3d 1, 7 (1st Cir. 2015) (citing *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).

A party seeking summary judgment is responsible for identifying those portions of the record, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden either by "offering

evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute." *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325). In ruling on summary judgment, the court "view[s] 'the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" *Padilla-García v. Guillermo Rodríguez*, 212 F.3d 69, 73 (1st Cir. 2000) (quoting *Euromotion, Inc. v. BMW of N. Am., Inc.*, 136 F.3d 866, 869 (1st Cir. 1998)).

B. Analysis

1. Count I: Defamation

Garcia identifies only two allegedly defamatory statements in his opposition to Defendant's motion for summary judgment.[6] The first is Kelly's January 18, 2013 statement to Lt. Kearney indicating that he believed Garcia and Chin were responsible for the December 21, 2012 theft (Dkt. No. 81 at 12). The second is Holland's February 15, 2013 statement to Lt. Kearney that Garcia was on the Needham shuttle on January 2, 2013.

Under Massachusetts law, "[d]efamation is the intentional or reckless publication, without privilege to do so, of a false statement of fact which causes damage to the plaintiff's reputation." *Elicier v. Toys "R" Us, Inc.,* 130 F. Supp. 2d 307, 310 (D. Mass. 2001) (citing *Correllas v. Viveiros,* 572 N.E.2d 7, 10 (Mass. 1991)). *See also Flagg v. AliMed, Inc.*, 992

---

[6] In his complaint, Garcia also discusses statements Holland made in the SIRs he prepared on January 15, 2013 and February 8, 2013, "in which he asserted … that Garcia had participated in a theft," and which he "sent … to other individuals employed by or working on behalf of Garda" (Dkt. No. 1-1 at 7, ¶¶ 17-18; 11-12 ¶¶ 40-41). However, Garcia does not argue that these alleged defamatory statements survive summary judgment.

N.E.2d 354, 365 (Mass. 2013) ("In order to state a claim of defamation, a plaintiff must allege facts indicating that (1) the defendant published a false statement regarding the plaintiff – that is, the defendant communicated the statement concerning the plaintiff to a third party; (2) the statement could damage the plaintiff's reputation in the community; and (3) the statement caused economic loss or is otherwise actionable without proof of economic loss." (citing *White v. Blue Cross & Blue Shield of Mass., Inc.*, 809 N.E.2d 1034, 1036 (Mass. 2004)). "[T]he imputation of a crime is defamatory per se, requiring no proof of special damages." *Phelan v. May Dep't Stores Co.*, 819 N.E.2d 550, 554 (Mass. 2004) (citing *Lynch v. Lyons*, 20 N.E.2d 953, 955 (Mass. 1939)).

"Under Massachusetts law, statements made to police … prior to trial are absolutely privileged if they are made in the context of a proposed judicial proceeding." *Correllas*, 572 N.E.2d at 11 (citing *Sriberg v. Raymond*, 345 N.E.2d 882, 883 (Mass. 1976); *Kipp v. Kueker*, 386 N.E.2d 1282, 1285-86 (Mass. App. Ct. 1979); J.R. Nolan & L.J. Sartorio, Tort Law § 130, at 196-97 (1989)). "An absolute privilege provides a defendant with a complete defense to a defamation suit even if the defamatory statement is uttered maliciously or in bad faith." *Mulgrew v. City of Taunton*, 574 N.E.2d 389, 391 (Mass. 1991) (citing *Ezekial v. Jones Motor Co.*, 372 N.E.2d 1281, 1284 (Mass. 1978)). Statements to the police reporting a crime where no criminal action or judicial proceeding is yet contemplated or proposed are conditionally privileged. *Correllas*, 572 N.E.2d at 12 (citing *Seelig v. Harvard Coop. Soc'y*, 246 N.E.2d 642, 646 (Mass. 1969); *Galvin v. New York, New Haven & Hartford R.R. Co.*, 168 N.E.2d 262, 265 (Mass. 1960); *Pihl v. Morris*, 66 N.E.2d 804, 807 (Mass. 1946); *Pion v. Caron*, 129 N.E. 369, 370 (Mass. 1921); *Zinkfein v. W.T. Grant Co.*, 128 N.E. 24, 27 (Mass. 1920); *Robinson v. Van Auken*, 76 N.E. 601, 602 (Mass. 1906); *Brow v. Hathaway*, 13 Allen 239, 242-43 (Mass. 1867)).

"A qualified or conditional privilege … immunizes a defendant from liability unless he or she acted with actual malice, *Tosti v. Ayik*, 437 N.E.2d 1062, 1065 (Mass. 1982), or unless there is 'unnecessary, unreasonable or excessive publication,' and the plaintiff establishes that the defendant published the defamatory information recklessly." *Mulgrew*, 574 N.E.2d at 391-92 (quoting *Bratt v. Int'l Bus. Machs. Corp.,* 467 N.E.2d 126, 129 (Mass. 1984)). "Situations … on the borderline between unsubstantiated reports of criminal activity and statements made in the course of proposed judicial proceedings, should be considered on a case-by-case basis." *Correllas*, 572 N.E.2d at 13 (citing *Devlin v. Greiner*, 371 A.2d 380, 388 (N.J. Super. 1977)). "A careful, fact-specific analysis will better balance the right of a plaintiff to preserve his or her reputation from defamatory accusations, with the right of society to secure the testimony of a witness in proposed and in actual judicial proceedings without the party or witness laboring under the threat of a civil law suit." *Id*.

Here, the parties agree that Kelly's January 18, 2013 statement is conditionally privileged, insofar as it was made before a judicial proceeding was contemplated or proposed. Defendants maintain that Holland's February 15, 2013 statement is absolutely privileged because a complaint had issued against Garcia as of January 21, 2013. Garcia argues that the statement is only conditionally privileged because the existing complaint related to the December 21, 2012 loss, while the allegedly defamatory statement related to the January 2, 2013 loss. The court concludes that application of a conditional privilege to Holland's February 15, 2013 statement strikes the appropriate balance under these circumstances where the challenged statement related to a separate incident for which no judicial proceeding was yet being contemplated or proposed.[7]

---

[7] Moreover, the case Defendants cite to support application of an absolute privilege, *Boyle v. Barnstable*, 818 F. Supp. 2d 284 (D. Mass. 2011), is inapposite. In that case, the alleged defamatory statements that were held absolutely privileged were contained in applications for criminal complaints, i.e. in the context of proposed criminal proceedings. *Id*. at 308.

Having determined that each of the contested statements are conditionally privileged, the burden is on Garcia to establish abuse of the conditional privilege by clear and convincing evidence. *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 47 (1st Cir. 2002) ("On motion for summary judgment, the plaintiff bears the burden of establishing abuse of the conditional privilege by clear and convincing evidence." (citing *Catrone v. Thoroughbred Racing Ass'ns of N. Am., Inc.*, 929 F.2d 881, 889 (1st Cir. 1991)). Again, Garcia can do this by showing Kelly or Holland acted with actual malice, *Tosti*, 437 N.E.2d at 1065, or published the defamatory statements recklessly and engaged in unnecessary, unreasonable, or excessive publication. *Mulgrew*, 574 N.E.2d at 391–92. Garcia does not meet that burden here as to either statement.

Under Massachusetts law, malice exists "when the 'defamatory words, although spoken on a privileged occasion, were not spoken pursuant to the right and duty which created the privilege but were spoken out of some base ulterior motive.'" *Dragonas v. Sch. Comm. of Melrose*, 833 N.E.2d 679, 687 (Mass. App. Ct. 2005) (quoting *Dexter's Hearthside Rest., Inc. v. Whitehall Co.*, 508 N.E.2d 113, 117 (Mass. App. Ct. 1987)). Garcia points to no evidence to suggest that Kelly or Holland had an ulterior motive in making the contested statements to Lt. Kearney. Rather, Garcia posits that he is entitled to an inference of malice based on Garda's alleged spoliation of the case files, failure to identify and preserve material and relevant evidence, and/or its failure to produce a properly prepared 30(b)(6) witness (Dkt. No. 81 at 15). However, Garcia does not develop any of these asserted bases, and he has not shown that he is entitled to the adverse inference he seeks. "Before an adverse inference can arise [based on spoliation], the sponsor of the inference must lay an evidentiary foundation, proffering evidence sufficient to show that the party who destroyed the document 'knew of (a) the claim (that is, the

litigation or potential for litigation), and (b) the document's potential relevance to that claim.'"

*Booker v. Mass. Dep't of Pub. Health*, 612 F.3d 34, 46 (1st Cir. 2010) (quoting *Testa v. Wal-Mart Stores, Inc.*, 144 F.3d 173, 177 (1st Cir. 1998)). An adverse inference is not warranted "absent this threshold showing, because the trier of fact would have no basis for inferring that the destruction of documents stemmed from the party's consciousness that the documents would damage his case." *Id*. Garcia does not even attempt to make the required showing for spoliation, and it is unwarranted here. The undisputed evidence establishes that Zanatta was unable to locate the case file and the overnight video surveillance evidence was gone before the criminal case was dismissed on September 24, 2014, while Garcia did not file his civil action until June 22, 2015, nearly nine months later. Further, the court has rejected Garcia's argument that he is entitled to any sanction against Defendants in connection with their 30(b)(6) witness, let alone a sanction wholly unrelated to the claimed discovery abuse.

Garcia also argues that Kelly's and Holland's statements lost their qualified privilege because they acted in reckless disregard of Garcia's rights. However, Garcia points to no facts to establish that Kelly or Holland acted recklessly in making their contested statements.[8] Even if he did, it would still be insufficient to overcome the conditional privilege. Loss of the conditional privilege requires proof both that Kelly and Holland acted recklessly and that they engaged in "unnecessary, unreasonable or excessive publication," *Bratt*, 467 N.E.2d at 132, and there is no evidence of the latter here, where Kelly and Holland made the statements only to Lt. Kearney and in the context of reporting suspected thefts to law enforcement. Because Plaintiff has not met his burden of establishing abuse of the conditional privilege by clear and convincing

---

[8] Instead, Garcia makes a bald assertion that "[t]he facts (some of which are undisputed) which would permit a jury to find that Garda's [sic] acted with a reckless disregard for Garcia's rights are ample and easily sufficient to withstand summary judgment," without identifying what any of those facts are (Dkt. No. 81 at 15).

evidence with respect to either Kelly's or Holland's statement, Defendants are entitled to summary judgment on Count I of Garcia's complaint for defamation.

### 2. Count II: Malicious Prosecution

Garcia claims that Defendants maliciously prosecuted him in connection with the September 17, 2012, December 21, 2012, and January 2, 2013 losses. To prevail on a malicious prosecution claim under Massachusetts law, a plaintiff must prove that the defendant, without probable cause and with malice, instituted criminal proceedings that terminated in the plaintiff's favor. *Limone v. United States*, 579 F.3d 79, 89 (1st Cir. 2009)). *See also Correllas,* 572 N.E.2d at 10 ("To prove malicious prosecution, [the plaintiff] must show that [the defendant] instituted criminal proceedings against [the plaintiff] with malice and without probable cause and that those proceedings terminated in favor of [the plaintiff]."). Because Garcia fails to create a triable issue as to at least two or three of these elements as to each loss, summary judgment in Defendants' favor is appropriate.

### a. Probable Cause

Want of probable cause is the essential ground of an action for malicious prosecution, and the plaintiff has the burden of proof on the issue. *Lincoln v. Shea*, 277 N.E.2d 699, 702 (Mass. 1972). Lack of probable cause must be "'affirmatively proved, and may not be inferred from the existence of malice … or from the fact of acquittal or anything else.'" *Id.* (alteration in original) (quoting *Higgins v. Pratt*, 56 N.E.2d 595, 598 (Mass. 1944)). "Probable cause has been defined as 'such a state of facts in the mind of the defendant as would lead a person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the plaintiff has committed a crime.'" *Bliss v. Fisher*, 842 F. Supp. 2d 400, 403 (D. Mass. 2012) (quoting *Bednarz v. Bednarz*, 542 N.E.2d 300, 302 (Mass. App. Ct. 1989)). "'The defendant's conduct

must be adjudged by his honest and reasonable belief at the time … rather than by what may turn out later to have been the actual state of things.'"  *Lincoln*, 277 N.E.2d at 702 (footnote omitted) (quoting *Muniz v. Mehlman*, 99 N.E.2d 37, 41 (Mass. 1951)).  Whether the defendant acted reasonably depends on all of the facts of the case, *id.*, and the defendant's duty is not to determine if there is a defense, but rather, whether there is probable cause for a prosecution. *Higgins*, 56 N.E.2d at 598.  "[W]hen the facts are fully established or undisputed, probable cause becomes a question of law."  *Keefe v. Johnson*, 24 N.E.2d 520, 523 (Mass. 1939) (citing *Bannon v. Auger*, 160 N.E. 255, 258 (Mass. 1928); *Griffin v. Dearborn*, 96 N.E. 681, 682 (Mass. 1911); *Casavan v. Sage*, 87 N.E. 893, 894 (Mass. 1909)).

Applying this standard, Garcia has not met his burden of showing that the Defendants lacked probable cause with respect to the December 21, 2012 loss.  At the time of Kelly and Zanatta's meeting with Lt. Kearney on January 18, 2013 and Holland's meeting with Lt. Kearney on January 21, 2013, the available information showed that, on December 20, 2012, 29 deposit bags were placed into a clearing bag, whereupon it was sealed, placed inside the Garda Springfield vault, and sat untouched overnight.  On December 21, 2012, the clearing bag was signed over to Garcia and Chin for delivery to Loomis Boylston, where, upon arrival, it was unsealed and found to have only 24 deposit bags, with the five missing bags containing $76,000. The only two people with access to the clearing bag during the time the money went missing were Garcia and Chin, and both denied any involvement in or knowledge about the theft. Viewing these undisputed facts in the light most favorable to Plaintiff, Kelly, Zanatta, and Holland could "reasonably [have] believe[d], or entertain[ed] an honest and strong suspicion," *Bliss*, 842 F. Supp. 2d at 403, that Garcia or Chin, or both of them acting together, had stolen the

money.[9]  Indeed, based on this evidence, Lt. Kearney swore out a criminal complaint against

Garcia, the Grand Jury indicted Garcia and Chin for the loss, and a Massachusetts Superior Court

judge – in a well-reasoned memorandum and order – found that the indictment was supported by

probable cause.  *See Counter v. Healy*, No. 09-12144-RGS, 2010 WL 2802174, at *1 (D. Mass.

July 13, 2010) (observing that a finding of probable cause by a district court judge or a grand

jury can be considered as evidence on the issue of the existence of probable cause) (citing *Willis*

*v. Gurry*, 116 N.E.2d 689, 690 (Mass. 1954); *Perkins v. Spaulding*, 65 N.E. 72, 72 (Mass.

1902)).

This conclusion does not change based on the disputed facts that form the basis of

Plaintiff's claim that Defendants' investigation was grossly deficient.  Plaintiff claims that Kelly

should have looked for other losses on January 18, 2013 as a result of Diaz's statement about

having received calls about other missing bags, and, if he had, he would have discovered the

January 2 and 3, 2013 losses that day, and would have learned that Garcia was not on the

Needham shuttle on either of those dates.  According to Plaintiff's logic, this would have

eliminated any suspicion relative to Garcia.  The court disagrees.  According to Garcia, Kelly

was already aware of the September 17, 2012 loss, for which Garcia was on the shuttle.

Certainly, knowing that Chin was the only Garda employee on the Needham shuttle for all four

losses would increase one's suspicion of Chin.  But the fact that Garcia was on the Needham

shuttle for two of the four losses would make it reasonable to believe that Garcia was involved in

at least those two losses.  Plaintiff also claims that Kelly did not ask Plaintiff – as he claimed to

---

[9] Garcia argues that "[m]erely being one of two people with the opportunity to commit a crime is insufficient to establish the guilt of either," and "Garda recognized [from the start] that Chin could have been the sole perpetrator" (Dkt. No. 81 at 19 (citing *Commonwealth v. Salemme*, 481 N.E.2d 471 (Mass. 1985)).  The question, however, is not whether there was sufficient evidence for Defendants to establish Garcia's guilt beyond a reasonable doubt; it is whether they lacked probable cause.

have – if Chin ever left Plaintiff's sight during the run on December 21, 2012; if he had, Garcia would have told Kelly that he left Chin alone in the truck while he went inside the jewelry store and Loomis Boylston. Again, accepting Plaintiff's version of the facts, the outcome of the probable cause analysis does not change. Under Plaintiff's version, Kelly did not ask the question. Thus, Kelly would have been justified in entertaining an honest and strong suspicion that both Garcia and Chin were responsible for the theft. While Garcia might be able to point a finger at Chin and vice versa based on these disputed facts, the question at this juncture is not whether Garcia had a viable defense, but rather whether Defendants lacked probable cause. Plaintiff fails to create a triable issue on this element as to the December 21, 2012 loss.

The parties do not devote any briefing to address the issue of probable cause as to the prosecution for the September 17, 2012 loss, other than Defendants' single, unsupported statement that, "again, Garcia and Chin were the only ones with access to the lost money" (Dkt. No. 74 at 14). Plaintiff simply lumps the prosecution for the September 17, 2012 loss in with the prosecution for the January 2, 2013 loss, based on Holland's reporting of both losses to Lt. Kearney at the same time. On this record, the court would be justified in concluding that Plaintiff has failed to show a lack of probable cause as to the September 17, 2012 loss.

Finally, applying the probable cause standard to the January 2, 2013 loss, Garcia has created a triable issue as to the lack of probable cause. The analysis as to this loss is much simpler, insofar as the complaint that issued against Garcia in connection with it was based on Holland's erroneous statement that Garcia was on the shuttle that day. Given that Garcia was not on the Needham shuttle that day, a reasonably prudent person would not be justified in believing, or entertaining a strong suspicion based on the then-available evidence, that Garcia had committed the theft.

For these reasons, Plaintiff has failed to show lack of probable cause for the prosecution related to the December 21, 2012 or September 17, 2012 losses, but has shown a lack of probable cause for the January 2, 2013 loss.

### b. Instituted Criminal Proceedings

> In broad brush, an individual may be said to have instituted criminal proceedings against another if he caused those proceedings to be initiated. *See Witham v. Gregory & Read Co.*, 137 N.E. 752, 752 (Mass. 1923); *Mason v. Jacot*, 127 N.E. 331, 333 (Mass. 1920); *Tangney v. Sullivan*, 39 N.E. 799, 799–800 (Mass. 1895). The paradigmatic example exists when a person formally swears out a criminal complaint against another person. *See, e.g., White v. Apsley Rubber Co.*, 80 N.E. 500, 501 (Mass. 1907). But malicious prosecution is by no means restricted to this paradigm. If an individual induces another person (say, a police officer or prosecutor) to lodge formal criminal charges, he may be held to have instituted the criminal proceedings. *See, e.g., Jones v. Schein*, 103 N.E. 57, 58 (Mass. 1913); *Tangney*, 39 N.E. at 800. So, too, if an individual either exercises a peculiar degree of control over the charging official or adamantly presses that official to bring a criminal complaint, he may be held responsible for the institution of the prosecution. *See, e.g., Seelig*, 246 N.E.2d at 646; *Conway v. Smerling*, 635 N.E.2d 268, 271 (Mass. App. Ct. 1994).

*Limone*, 579 F.3d at 89. On the other hand, "[t]he mere transmission of information to a police officer, who using his or her independent judgment, then pursues the matter and institutes criminal proceedings, has never been held sufficient to support an action for malicious prosecution." *Correlas*, 572 N.E.2d at 10 (citing *Burnham v. Collateral Loan Co.*, 60 N.E. 617, 617-18 (Mass. 1901); *Ziemba v. Fo'cs'le, Inc.*, 475 N.E.2d 1223, 1225 (Mass. App. Ct. 1985)).

Applying this standard, Plaintiff has failed to create a triable issue as to whether Defendants instituted criminal proceedings. Viewing the undisputed facts in the light most favorable to Garcia, Kelly, Zanatta, and Holland simply transmitted information to Lt. Kearney, while Lt. Kearney used his own judgment to pursue the matter and apply for criminal complaints against Garcia. As Defendants point out, there is no evidence that Kelly, Zanatta, or Holland

ever asked Lt. Kearney to prosecute Garcia in connection with any of the losses or exerted any control over his decision to file criminal complaints against Garcia or over the District Attorney's decision to present the case to the Grand Jury. To the contrary, the uncontested evidence shows that Lt. Kearney did not file the first criminal complaint based simply on the Defendants' reports, but rather, he went to Garda Springfield to review the overnight surveillance video himself first. Similarly, the District Attorney sought an indictment relative to only one of the losses.

In an effort to try to create a triable issue as to the institution of criminal proceedings, Garcia relies on *Limone* for the proposition that "an individual who transmits untruthful information to an official with power to charge sometimes may be said to have instituted an ensuing criminal proceeding brought by that official." *Id*., 579 F.3d at 89. Garcia does not identify any untruthful information Kelly, Zanatta, or Holland gave to the police regarding the September 17, 2012, or December 21, 2012 charges. The only untruthful information Garcia identifies is related to the January 2, 2013 loss, for which Holland initially reported that Garcia was on the Needham shuttle, when he was not. However, as the *Limone* court goes on to note, not "every provider of false information, nor even every bad-faith provider of false information, may be said to have instituted an ensuing criminal proceeding." *Id*. "The question of whether such an individual has instituted a criminal proceeding depends on the circumstances." *Id*. at 90. The circumstances here are insufficient to create a triable issue where the undisputed evidence shows that Holland did not ask that criminal proceedings be instituted in connection with the January 2, 2013 loss, and he contemporaneously provided Lt. Kearney with the manifest accurately showing that Caragnano was on the shuttle rather than Garcia.

Garcia also cites *Carroll v. Gillespie*, 436 N.E.2d 431, 436 (Mass. App. Ct. 1982), for the principle that "private persons are not at liberty to initiate criminal prosecutions precipitously, on the basis of information which is neither reasonably complete nor reliable." Garcia suggests that Defendants violated this principle based on their "grossly deficient" investigation and Kelly's "reckless" report to the police (Dkt. No. 81 at 18), premised primarily on "Kelly's singular disinterest in evidence of additional missing deposits" (Dkt. No. 81 at 9). This case is easily distinguishable from *Carroll*, however. In *Carroll*, the defendant, the owner of a car dealership, reported to the police that the plaintiff had forged her signature on a check in the dealership office, while he later admitted that he had no personal knowledge at the time he made the statement, or at any other time, whether the plaintiff had signed the check. In addition, the defendant in *Carroll* told the police that he wanted the plaintiff to be arrested. *Id.*, 436 N.E.2d at 433-34, 437. Here, the Defendants did make reports based on their personal knowledge, and they did not ask that Garcia be arrested or prosecuted.

For these reasons, Garcia fails to create a triable issue as to the institution of criminal proceedings.

        c. <u>Malice</u>

To show malice, a plaintiff must show that the defendant knew there was no probable cause and acted with malice. *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 82 (Mass. 1987) (citing *Beecy v. Pucciarelli*, 441 N.E.2d 1035, 1038-39 (Mass. 1982)). Malice necessitates an improper motive, which "may be one of vexation, harassment, annoyance, or attempting to achieve an unlawful end or a lawful end through an unlawful means." *Beecy*, 441 N.E.2d at 1039 n.9. "Sometimes, the lack of probable cause is so obvious that an inference of malice is warranted." *Foley*, 508 N.E.2d at 82 (citing *Beecy*, 441 N.E.2d at 1039).

Here, Garcia does not argue Defendants acted with an improper motive, but rather that malice should be inferred based on an obvious lack of probable cause (Dkt. No. 81 at 20).  As Defendants observe, the lack of probable cause standard "is an objective one in the sense that if the facts would justify a reasonable person in thinking that a crime had been committed, then a complaint to the police is warranted, *Carroll*, 436 N.E.2d at 435, and indeed, ought not to be discouraged by fear of subjecting the complainant to a lawsuit."  *Conway*, 635 N.E.2d at 271-72 (citing *Ziemba*, 475 N.E.2d at 1226; *Bednarz*, 542 N.E.2d at 303).  Here, a reasonable person would be justified in thinking that a crime had been committed where money went missing on each of the occasions for which Defendants made a report, and a complaint to the police was warranted.

Garcia also argues that malice should be inferred from certain additional facts, including that Kelly did not ask him if he ever left Chin alone in the truck, but falsely reported that he had asked, and that Garcia stated that he had not left Chin alone; that Holland told the Grand Jury the only access to the money would have been from the outside of the truck, while he testified in his deposition that there was an emergency hatch behind the seats from which the rear of the truck could be accessed from the inside, and that, while it was generally bolted, he did not know if it was bolted on any of the four dates in issue; that Kelly did not investigate other instances of missing money on January 18, 2013, despite Diaz's statement that there had been other instances when he had received calls about missing money; that Kelly did not make any effort to locate and secure any documentary or video evidence relative to the September 17, 2012 loss; that Kelly did not contact anyone at Loomis Boylston with respect to the September 17, 2012 and January 2 and 3, 2013 losses; that Kelly did not request that Loomis Boylston preserve and maintain video evidence from the September 17, 2012 or January 2 or 3, 2013 losses and did not

tell the SPD that Garda was not going to make efforts to maintain and preserve video evidence; and that Kelly was unaware that sometimes Garcia had to wait inside Loomis Boylston for as long as an hour for a truck bay to open, during which time the driver was alone in the shuttle (Dkt. No. 81 at 20 (citing SDMF 10, 17-19, 22-24, 25, 38-39)).  Garcia cites no legal authority for this proposition, nor does he offer any argument as to how any of these disputed facts would give rise to an inference of an improper motive on the part of any of the Defendants, and it is not readily apparent why such an inference would be reasonable or appropriate.

Finally, Garcia argues that malice should be inferred from Defendants' "loss or destruction of the investigatory files" (Dkt No. 81 at 20).  As an initial matter, there is no evidence that the case files were destroyed.  The undisputed evidence is that Zanatta went through Kelly's materials and was unable to locate the case file and that he turned over everything he could locate to the District Attorney.  Setting that discrepancy aside, however, "[t]he malice element of malicious prosecution requires that the accuser knew there was no probable cause for the commencement of the action, and that the accuser acted with an improper motive."  *Wilmot v. Tracey*, 938 F. Supp. 2d 116, 149 (D. Mass. 2013) (quoting *Gouin v. Gouin*, 249 F. Supp. 2d 62, 71 (D. Mass. 2003)).  Thus, the focus is on Defendants' states of mind when they made their reports to the SPD in January and February 2013, and not at some subsequent time when the case files were lost or destroyed.

For these reasons, Plaintiff fails to create a triable issue of fact as to the element of malice.

3. <u>Counts IV and V:  Inflicion of Emotional Distress</u>

*(a) Workers' Compensation Act Exclusivity*

Before addressing the merits of Garcia's claims for intentional and negligent infliction of emotional distress, the court must first determine whether the claims are barred by the exclusivity provision of the Workers' Compensation Act ("WCA").  *See* Mass. Gen. Laws ch. 152, § 24.  The WCA provides that an employee waives the right to recover for personal injuries against an employer at common law, if the WCA would otherwise provide compensation for personal injury.  *Id.*  "The WCA exclusivity provision stops a common law tort claim when 1) the plaintiff is an employee, 2) the plaintiff's condition is shown to be a 'personal injury' within the meaning of the WCA, and 3) 'the injury is shown to have arisen out of and in the course of employment.'"  *Luthy v. Proulx*, 464 F. Supp. 2d 69, 76-77 (D. Mass. 2006) (quoting *Foley Polaroid Corp.*, 413 N.E.2d 711, 713-14 (Mass. 1980)).[10]  "Massachusetts courts construe this provision broadly, and the waiver covers intentional and negligent infliction of emotional distress …."  *Andresen v. Diorio*, 349 F.3d 8, 16 (1st Cir. 2003) (citing *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 146 n.7 (1st Cir. 1998)).

The question presented in this case is whether Garcia was an employee at the time of the alleged tortious infliction of emotional distress.  To analyze that issue, the contours of the two claims must be delineated.  Garcia does not identify in his complaint what precise conduct of Defendants forms the basis for his intentional infliction of emotional distress claim.  In his opposition to the motion for summary judgment, however, Garcia clarifies that his claim relates

---

[10] "The Act not only bars suits for negligence and intentional torts against an employer, but also against co-workers 'if the fellow employee also was acting in the course of employment.'" *Grant v. John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344, 365 (D. Mass. 2002) (quoting *Anzalone v. Mass. Bay Transp. Auth.*, 526 N.E.2d 246, 249 (Mass. 1988)).  It is undisputed here that Kelly, Zanatta, and Holland were all acting within the scope of their employment at all times (DSUF 87; PRDSUF 87).

only to the time period after the close of Kelly and Zanatta's interview on January 18, 2013, at which point Garcia claims he was effectively terminated (Dkt. No. 81 at 22). Thus, Garcia's intentional infliction of emotional distress claim does not encompass any actions by Defendants before that interview or to their actions in carrying out the interview itself.[11] Rather, it is premised on their subsequent actions in making their reports to the police on January 18, January 21, February 15, and February 21, 2013. Garcia's negligent infliction of emotional distress claim is premised on the theory that Defendants owed a duty to Garcia to exercise reasonable care in their investigation and that they breached that duty by carelessly and negligently conducting the investigation.

"'Generally, termination of employment extinguishes an employer's [worker's compensation] liability for an injury to an employee which occurs after his discharge' ...." *Grant v. John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344, 366 (D. Mass. 2002) (quoting *Larocque's Case*, 582 N.E.2d 959, 960 (Mass. App. Ct. 1991)). However, coverage has been extended in cases where "the post-termination activity is closely related to the employment, both in time and place.'" *Id.* (quoting *Larocque's Case*, 582 N.E.2d at 960). *See also Andresen*, 349 F.3d at 16 ("[U]nder Massachusetts case law, the statute covers broadly any injury that arises out of the employment relationship regardless of whether it occurs during the precise period of employment." (citing *Grant*, 183 F. Supp. 2d at 366); *Chan v. Immunetics, Inc.*, No. 98-0388D, 1999 WL 218490, at *4 (Mass. Super. Apr. 7, 1999)). So, for example, courts have held the WCA exclusivity bar applicable to claims by workers for injuries sustained after they had been

_____

[11] In his opposition, Garcia states that he "does not claim that his injuries arose from that interview. .... Gardas' [sic] postemployment action (and inactions) form the basis for all of Garcia's causes [sic]" (Dkt. No. 81 at 22). If Garcia was basing his claim on the conduct of the interview, it would be barred by the exclusivity provision because there is no dispute that he was still an employee at the time.

terminated, but while they were still on the premises of the employer winding up their

employment. *See Grant*, 183 F. Supp. 2d at 366 (granting summary judgment to the defendants

on the plaintiff's claims for assault, battery, and infliction of emotional distress on WCA

exclusivity grounds for injuries sustained when the plaintiff was being escorted to his cubicle to

finish cleaning out his belongings after he had been terminated and had already taken some of his

belongings home); *Zygmuntowicz v. Am. Steel & Wire Co. of N.J.*, 134 N.E. 385, 387 (Mass.

1922) (holding that the trial court erred in denying defendant's motion for a directed verdict on

the plaintiff's count for assault based on injuries sustained while the plaintiff was on the

premises of his employer objecting to his discharge); *Chan*, 1999 WL 218490, at *4 (dismissing

claims for assault and battery for employee allegedly injured while being dragged out of the

building after termination). On the other hand, the WCA exclusivity provision has been held not

to apply to actions for injuries occurring later in time after the employee has been discharged and

is no longer on the employer's premises. *See Grant*, 183 F. Supp. 2d at 367 (denying summary

judgment for defendants on the plaintiff's claim for intentional infliction of emotional distress

based on corporate counsel's involvement in the plaintiff's prosecution and decision to continue

to prosecute him); *Chan*, 1999 WL 218490, at *4 (denying motion to dismiss claims for

infliction of emotional distress that allegedly occurred after the termination of the plaintiff's

employment). *See also Larocque's Case*, 582 N.E.2d at 960 (holding worker's compensation

benefits precluded for a claimant who sustained a heart attack two weeks after his discharge and

in his home).

Applying this standard to the undisputed facts, the WCA exclusivity bar does not apply to

Plaintiff's claim for intentional infliction of emotional distress, but it does apply to Plaintiff's

claim for negligent infliction of emotional distress. As to the former, the record evidence

suggests that the Defendants' meetings with Lt. Kearney took place at the SPD, and they took place after the conclusion of Garcia's interview, some of them weeks later. Even Kelly and Zanatta's meeting with Lt. Kearney that took place on the same day was not in the course of Garcia's employment, in the sense of the wrapping up of his employment. The court finds the case Defendants rely on, *Luthy*, distinguishable. In *Luthy*, the plaintiff, a former tax clerk, was fired from the city tax collector's department and arrested and charged with theft of funds in connection with missing cash payments. *Id*., 464 F. Supp. 2d at 71-72. She was ultimately acquitted of the charges at trial. *Id*. at 72. She subsequently brought suit against the city for, *inter alia*, negligent infliction of emotional distress. *Id*. The court dismissed the plaintiff's claim, finding that it was barred by the WCA exclusivity provision.

> Although [the plaintiff] complains that her injury was caused by [the defendants'] actions both during, and subsequent to her employment with the [tax] Department, the fact that [the plaintiff] continued to suffer an injury after her termination does not render the WCA inapplicable. The roots of [plaintiff's] injury are the circumstances surrounding her termination, namely the City's alleged failure to conduct a proper investigation. …. The only allegedly negligent action, the failure to investigate, occurred while she was a Department employee, and "arose out of and in the course of her employment."

*Id*. at 77. By contrast, here, the alleged intentionally tortious acts – the Defendants' reports to the police – occurred after the end of Garcia's interview on January 18, 2013. Thus, Plaintiff's claim of intentional infliction of emotional distress is not barred as a matter of law.

As for the negligent infliction claim, Plaintiff bases it on Defendants' supposed negligent investigation. Defendants represent that their investigation ended once they involved the SPD (DSUF 38-39). Plaintiff purports to dispute this on the basis of testimony by Holland that the investigation was still going on when he was discharged from Garda, which did not occur until sometime after he testified before the Grand Jury on June 19, 2013 (PRDSUF 38-39). However,

Plaintiff does not identify anything the Defendants did in their investigation after their report to the police on January 18, 2013 that was purportedly negligent and could support his claim. As Plaintiff states in his brief in opposition to summary judgment, "Kelly's singular disinterest in evidence of additional missing deposits is at the core of the Plaintiff's claim that Garda's investigation was grossly negligent or deliberately reckless (Dkt. No. 81 at 9). This alleged act of negligence occurred before Kelly met with Lt. Kearney. Because the WCA exclusivity analysis presents a close question, however, the court will proceed to analyze both claims on their merits.

*(b) Counts IV:  Intentional Infliction of Emotional Distress*

While Plaintiff's claim for intentional infliction of emotional distress clears the WCA exclusivity bar, it fails on its merits as a matter of law. "One who, by extreme and outrageous conduct and without privilege, causes severe emotional distress to another is subject to liability for such emotional distress even though no bodily harm may result." *Agis v. Howard Johnson Co.*, 355 N.E.2d 315, 318 (Mass. 1976). To make out a claim for intentional or reckless infliction of emotional distress under Massachusetts law, a claimant must prove:

> (1) that the [defendant] intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it.

*Id.* at 318-19 (citations and internal quotation marks omitted).[12] "Liability cannot be predicated on 'mere insults, indignities, threats, annoyances, petty oppressions or other trivialities' nor even

---

[12] In Massachusetts, claims of intentional and reckless infliction of emotional distress are analyzed in the same manner. *See Nancy P. v. D'Amato*, 517 N.E.2d 824, 827 (Mass. 1988)

is it enough 'that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" *Quinn v. Walsh*, 732 N.E.2d 330, 338 (Mass. App. Ct. 2000) (quoting *Tetrault v. Mahoney, Hawkes & Goldings*, 681 N.E.2d 1189, 1197 (Mass. 1997)).

Here, as set forth above in connection with the court's discussion on defamation, Defendants' reports to the police were privileged, and intentional infliction of emotional distress claims cannot be based on privileged actions. *Agis*, 355 N.E.2d at 318. *See also Polay v. McMahon*, 10 N.E.3d 1122, 1129 (Mass. 2014) ("For a defendant's conduct to qualify as extreme and outrageous, the defendant must have acted 'without privilege.'" (quoting *Agis*, 355 N.E.2d at 318)). Moreover, "[s]ince [Garcia] ha[s] failed to show a lack of probable cause, the Defendants' alleged instigation of [Garcia's] prosecutions cannot be considered extreme and outrages [sic] or beyond the bounds of decency." *Bliss*, 842 F. Supp. 2d at 404. Accordingly, Defendants are entitled to summary judgment on Garcia's claim for intentional infliction of emotional distress.

### (c)  Count V:  Negligent Infliction of Emotional Distress

Plaintiff's claim for negligent infliction of emotional distress also fails on its merits. In a claim for negligent infliction of emotional distress, the plaintiff must demonstrate "1) negligence, 2) emotional distress, 3) causation, 4) physical harm manifested by objective symptomatology, and 5) that a reasonable person would have suffered emotional distress under the circumstances." *Taylor v. Swartwout*, 445 F. Supp. 2d 98, 105 (D. Mass. 2006) (citing *Conley v. Romeri*, 806 N.E.2d 933, 936 (Mass. App. Ct. 2004)). "The plaintiff['s] claim requires a basis to find that the

---

("We have placed reckless and intentional infliction of emotional distress in the same category.").

[Defendants] had been negligent, namely that the [Defendants] owed the [P]laintiff[] a duty that it had violated." *Urman v. S. Boston Sav. Bank*, 674 N.E.2d 1078, 1083 (Mass. 1997) (citing *Payton v. Abbott Labs*, 437 N.E.2d 171, 175 (Mass. 1982)). Here, Defendants' alleged duty was to exercise reasonable care in their investigation. The claim fails as a matter of law because Defendants owed no duty of care to Garcia under these circumstances. The Massachusetts Appeals Court has recognized that, "[a]n investigator's duty runs to the person or entity on whose behalf the investigation is conducted, not to the person being investigated." *O'Connell v. Bank of Boston*, 640 N.E.2d 513, 516 (Mass. App. Ct. 1994); *see also Maguire v. Commonwealth*, No. 00-P-1356, 2002 WL 31039719, at *1 (Mass. App. Ct. Sept. 12, 2002) (citing *O'Connell* for the proposition that the defendant did not owe a duty of care to a terminated employee to conduct an adequate investigation). Plaintiff rightly recognizes that *O'Connell* goes on to state that:

> [a] slipshod or incomplete investigation, without more, is a disservice to the one who commissioned the investigation, not to its subject. It is not until the investigation results in ill-founded allegations or charges of criminal conduct that the subject suffers cognizable injury. At that point, the law makes remedies available – actions for defamation, malicious prosecution, tortious infliction of emotional distress – albeit under very circumscribed conditions.

*Id.*, 640 N.E.2d at 516. However, the very next sentence makes clear that the potential causes of action available in these "very circumscribed conditions" do not include negligence: "[t]he individual falsely accused is thus not remediless, but negligence alone does not make his or her accuser liable." *Id. See also id.* ("Because an investigation that was merely negligent could not entitle the plaintiff to recover, the judge properly decided that count added nothing to the count of malicious prosecution. The negligent investigation count was properly dismissed.") Thus, Defendant is entitled to summary judgment on Plaintiff's claims for negligence and negligent

infliction of emotional distress. Defendants are also entitled to summary judgment on Plaintiff's

claim for negligent infliction of emotional distress because Plaintiff has mustered no more than

evidence of negligence on Defendants' part.

IV.    CONCLUSION

For the reasons set forth herein, the undersigned recommends that Defendants' special

motion to dismiss be DENIED and Defendants' motion for summary judgement be GRANTED

as to all remaining counts of Plaintiff's complaint as to all Defendants.[13]

Dated: August 14, 2017                    /s/ Katherine A. Robertson
                                          KATHERINE A. ROBERTSON
                                          UNITED STATES MAGISTRATE JUDGE

---

[13] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.